## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Marcus A. Nussbaum, Esq. (MN 9581)
FISHKIN, GURSHUMOV & NUSSBAUM, P.C.
3059 Brighton 7th Street, 1st Fl.
Brooklyn, NY 11235
Tel: 718-509-0609
Fax: 888-432-1822
office@FGNLawFirm.com
*Attorneys for Plaintiffs*

| | |
|---|---|
| NVARD SRABYAN, A.V., *a minor, by his parent and guardian ad litem*, NVARD SRABYAN and M.V., *a minor, by her parent and guardian ad litem*, NVARD SRABYAN, *individually and on behalf of all others similarly situated*,<br><br>    *Plaintiffs,*<br><br>    – *vs.* –<br><br>THE STATE OF NEW YORK, NEW YORK STATE EDUCATION DEPARTMENT, ANDREW CUOMO, *in his personal capacity and official capacity as Governor of the State of New York*, SHANNON TAHOE *in her personal capacity and official capacity as Interim Commissioner of Education for the State of New York*, BILL De BLASIO *in his personal capacity and official capacity as Mayor of New York City*, THE CITY OF NEW YORK, THE NEW YORK CITY DEPARTMENT OF EDUCATION, and RICHARD A. CARRANZA, *in his personal capacity and official capacity as Chancellor of the New York City Department of Education*,<br><br>    *Defendants.* | CIVIL ACTION NO. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs **A.V.**, *a minor, by his parent and guardian ad litem*, NVARD SRABYAN, **M.V.,** *a minor, by her parent and guardian ad litem*, NVARD SRABYAN, and NVARD SRABYAN on her own behalf, ("Plaintiffs"), individually, and on behalf of all others similarly situated, by their undersigned attorneys, FISHKIN, GURSHUMOV & NUSSBAUM, P.C., by and for their complaint against the defendants herein, state and allege as follows:

1

# <u>TABLE OF CONTENTS</u>

<u>*Page*</u>

<u>INTRODUCTION</u>..................................................................................................2

<u>JURISDICTION AND VENUE</u>........................................................................10

<u>THE PARTIES</u>...................................................................................................11

<u>FACTUAL BACKGROUND</u>............................................................................12

    I.     TIMELINE OF EVENTS REGARDING COVID-19 OUTBREAK IN NEW YORK.............................................................................................12

    II.    IMPACT OF COVID-19 ON THE FINANCES OF THE STATE OF NEW YORK.............................................................................................14

    III.   PRACTICAL PROBLEMS ARISING OUT OF THE CURRENT PLANS FOR PUBLIC SCHOOL REOPENING IN SEPTEMBER OF 2020 INVOLVING PROPOSED <u>ALTERNATIVE LEARNING FORMATS</u>.......................16

<u>ADDITIONAL FACTUAL BACKGROUND</u>.................................................19

<u>LEGAL BACKGROUND</u>................................................................................23

<u>SPECIFIC ALLEGATIONS</u>...........................................................................26

    • **Civic Knowledge**.................................................................................26

    • **Civic Integration**.................................................................................29

<u>CLASS ACTION ALLEGATIONS</u>................................................................30

    • **Numerosity**..........................................................................................30

    • **Common Questions of Law**...............................................................31

    • **Typicality and Adequacy**..................................................................32

    • **Superiority**..........................................................................................32

<u>FIRST CLAIM FOR RELIEF</u> Violation of the Fourteenth Amendment Procedural Due Process Clause and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)............33

<u>SECOND CLAIM FOR RELIEF</u> Violation of the Fourteenth Amendment Substantive Due Process Clause and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)............36

<u>THIRD CLAIM FOR RELIEF</u> Violation of the Fourteenth Amendment Substantive Equal Protection Clause and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)........40

<u>FOURTH CLAIM FOR RELIEF</u> Violation of the Takings Clause (Regulatory Taking of the Fifth Amendment of the U.S. Constitution) and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)................................................................................42

<u>FIFTH CLAIM FOR RELIEF</u> Violation of the Contracts of the U.S. Constitution and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)................................46

**SIXTH CLAIM FOR RELIEF** Violation of the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b) ........................................................................................48

**SEVENTH CLAIM FOR RELIEF** Violation of the Sixth and Seventh Amendments to the United States Constitution as well as the requirements of the federal Jury Selection and Service Act, 28 U.S.C. sec. 186, and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)........................................................................................................................49

**EIGHTH CLAIM FOR RELIEF** Violation of the Republican Guarantee Clause of Article Four, Section Four of the United States Constitution, and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b).......................................................................................49

**NINTH CLAIM FOR RELIEF** Violation of the Ninth Amendment to the United States Constitution ........................................................................................................................50

**TENTH CLAIM FOR RELIEF** Violation of the Tenth Amendment to the United States Constitution ........................................................................................................................51

**ELEVENTH CLAIM FOR RELIEF** Violation of the Prohibition in the United States Constitution against Bills of Attainder and Ex Post Facto laws .................................52

**TWELFTH CLAIM FOR RELIEF** Violation of the Thirteenth Amendment to the United States Constitution ...............................................................................................................53

**THIRTEENTH CLAIM FOR RELIEF** Violation of Article I, Sections 1, 9, and 11 of the Constitution of the State of New York .................................................................................55

**FOURTEENTH CLAIM FOR RELIEF** Violation of Article III, Section 25 of the Constitution of the State of New York .................................................................................57

**FIFTEENTH CLAIM FOR RELIEF** Violation of Article IV, Section 3 of the Constitution of the State of New York .....................................................................................................58

**SIXTEENTH CLAIM FOR RELIEF** Violation of Article VII, Section 8 of the Constitution of the State of New York .................................................................................58

**SEVENTEENTH CLAIM FOR RELIEF** Violation of Article XI, Section 1 of the Constitution of the State of New York .................................................................................59

**EIGHTEENTH CLAIM FOR RELIEF** Permanent Injunction ............................................60

**PRAYER FOR RELIEF** ........................................................................................................62

**Exhibit "A"** .........................................................................................................................

## <u>INTRODUCTION</u>

> *"'And how many hours a day did you do lessons?' said Alice, in a hurry to change the subject.*
>
> *'Ten hours the first day,' said the Mock Turtle: 'nine the next, and so on.'*
>
> *'What a curious plan!' exclaimed Alice.*
>
> *'That's the reason they're called lessons,' the Gryphon remarked: 'because they lessen from day to day.'"*

- Lewis Carroll, <u>Alice's Adventures in Wonderland</u>

1.      This action arises out of recent decisions made by elected officials and government leadership in the City and State of New York in response to the COVID-19 pandemic on the issue of public education and plans for the reopening of schools in September of 2020. When considering the current plans in place for September of 2020 which are described in detail below, together with their adverse impact on the quality and quantity of education that all students are entitled to, one cannot help but remember the afore-mentioned famous words of Lewis Carroll in his novel, <u>Alice's Adventures in Wonderland</u>.

2.      This action is brought by Representatives Plaintiffs and the Class defined herein under the Constitution of the United States of America as applied to the States via the Fourteenth Amendment, and 42 U.S.C. § 1983, for civil rights violations suffered by Plaintiffs and the Class as a result of the actions of the Defendants The State of New York, The New York State Education Department, Andrew Cuomo, Bill De Blasio, The City of New York, and The New York City Department of Education.

3.      As a historical matter, The United States Declaration of Independence stated

2

specifically and unambiguously that:

> *...all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness...*

4.      As set forth herein, the right to an education is one of the 'unalienable rights' contemplated within the United States Declaration of Independence. This right cannot be taken away or denied and the recent actions of our leadership with regard to education plans for September of 2020 and thereafter are, at the bare minimum an attack on our liberties as well as unalienable, if not fundamental, rights for all students to have an equal opportunity to receive an education. At their worst, the recent actions of our leadership with regard to education plans for September of 2020 are deeply troubling and can be construed as an attempt to subvert our democratic government and move this nation a step closer towards totalitarianism.

5.      As described in detail herein, the recent actions of our leadership with regard to education plans for September of 2020 additionally adversely impact the right of Plaintiffs and the class to work for a living. This right to work is a fundamental right as articulated by the Supreme Court on many occasions, including the matter Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U.S. 746, 756-57, 4 S.Ct. 652 (1884).

6.      New York State Executive Law § 29-a of Article 2(b) authorizes the issuance of Executive Orders with all of the authority of a law introduced and enacted through traditional legislative processes for as long as said Orders remain in effect.

7.      The Constitution of the State of New York and The Constitution of the United States are controlling on the question of whether or not Executive Orders issued pursuant to New York State Executive Law § 29-a of Article 2(b) are constitutional.

8.      This matter arises out of Governor Cuomo's issuance of Executive Orders 202.4 as amended by 202.11 in response to the COVID-19 Pandemic (the "Pandemic"), as extended by

Executive Orders 202.14 and 202.18 et seq. (collectively, the Executive Orders"), which each bestowed unbridled authority upon Governor Cuomo to: close schools statewide; re-evaluate closures; and mandate plans for alternative instructional options, distribution and availability of meals and child care.

9.     Pursuant to the Executive Orders, every school in the state of New York was directed to close no later than Wednesday, March 18, 2020. School districts were ordered to develop a plan for alternative instructional options, distribution and availability of meals, and child care, to be submitted to the State Education Department.

10.     The New York City Department of Education has advised that there are several reopening scenarios officials are looking at for reopening of state schools, including split schedules and return to the classroom in waves, "blended learning," meaning some time spent in school buildings, combined with remote learning, "rolling" or "phased" starts, and the like.

11.     As a result of the Executive Orders, Plaintiffs and the Class have been deprived of their rights to, inter alia, equal treatment regardless of their race, ethnic background, religion, or sex, financial background, citizenship status, and have been deprived of right to educational services to students without disabilities but in need of extra assistance, educational services to students with disabilities, and fair and equal administration of: a) student treatment; b) student services; c) counseling and guidance; d) discipline; e) classroom assignment; f) grading; g) vocational education; h) recreation; i) physical education; and j) athletics.

12.     As of the time of the filing of this action, the Defendants have failed to issue any Executive Orders or pass any legislation offering relief to students including Plaintiff and the Class, which will address the numerous deficiencies and defects in the proposed reopening scenarios officials are looking at for reopening of state schools, including split schedules and return to the classroom in waves, "blended learning," meaning some time spent in school buildings,

combined with remote learning, "rolling" or "phased" starts, and the like.

13.     Plaintiffs in this case allege that the state Defendants have failed to carry out their responsibilities under the United States Constitution to provide all students a meaningful opportunity to obtain an education adequate to prepare them to be capable citizens. In San Antonio Ind't Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973), the U.S. Supreme Court raised, but failed to provide an answer to, the question of whether students have a fundamental right under the Fourteenth Amendment to the opportunity of an education that provides them "the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." Id. at 37. Plaintiffs are now asking this Court to consider this critical question and to answer it in the affirmative.

14.     The primary reason our public school system was created was to ensure that "under our republican government, … education … [must be] sufficient to qualify each citizen for the civil and social duties he will be called to discharge…" Horace Mann, Tenth Annual Report to the Massachusetts State Board of Education (1846).

15.     In the 21st century, numerous state courts have recognized the continuing — and even more urgent — need in our complex internet age for all citizens to receive a sound basic education that will prepare them "to function productively as civic participants."  Campaign for Fiscal Equity v. State, 801 N.E. 2d 326, 330 (NY 2003).

16.     "Mere competence in the basics — reading, writing and arithmetic — is insufficient… [a] broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute and flourish in the twenty-first-century."  Claremont Sch. Dist. v. Governor, 703 A.2d 1353, 1359 (N.H. 1997).

17.     Although the U.S. Supreme Court did not reach the precise question raised in the present case, in Brown v. Board of Education, a unanimous Court did hold that "education is

perhaps the most important function of state and local governments…It is the very foundation of good citizenship." <u>Brown v. Board of Education</u>, 347 U.S. 483, 493 (1954). The Supreme Court has also recognized that:

> "[E]ducation is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence," <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 221 (1972);

> "[The schools] are educating the young for citizenship," <u>Tinker v. Des Moines Indep. Sch. Dist.</u>, 393 U.S. 403, 507 (1969); and

> "Schools are where the 'fundamental values necessary for the maintenance of a democratic political system' are conveyed," <u>Plyler v. Doe</u>, 457 U.S. 202, 221 (1983).

18.     Despite this virtually universal recognition of the schools' responsibility to prepare young people to be capable citizens — and despite the specific language in the constitution of the State of New York that recognizes that the Legislature is responsible to provide for the maintenance and support of a system of free common schools, "…wherein all the children of this state may be educated…", the state Defendants, by their actions during the current COVID-19 pandemic, have failed to provide an adequate plan for the named Plaintiffs and tens of thousands of other students in the City and State of New York for an education that is adequate to prepare them to function productively as civic participants capable of voting, serving on a jury, understanding economic, social and political systems sufficiently to make informed choices, and to participate effectively in civic activities.

19.     After decades of neglect of the civic purposes of education, it is a stark fact that on the most recent examination of knowledge of civics administered in 2014 to a national sample of eighth graders by the National Assessment of Educational Progress (NAEP), only 23% of these students reached the "proficiency" level. The depth of ignorance that these scores reflect was further highlighted in a recent report on the schools' civic mission that recounted the following national statistics:

- Less than a third of eighth graders could identify the historical purpose of the Declaration of Independence, and less than a fifth of high school seniors could explain how citizen participation benefits democracy.

- In 2006, in the midst of both midterm elections and the Iraq [W]ar, fewer than half of Americans could name the three branches of government, and only four in ten young people (aged 18 to 24) could find Iraq on the map.

- Only one in five Americans between the ages of 18 and 34 read a newspaper, and only one in ten regularly click on news web pages.

Campaign for the Civic Mission of the Schools et al., Guardian of Democracy: The Civic Mission of Schools 14 (2011).

20.     Preparing students to be capable citizens is of heightened importance today as many of our democratic institutions are being challenged and compromised, in large part because of wide-spread ignorance of their importance and of the public support that is necessary to maintain them. In this climate, schools serve a vital function; they remain one of the few places in our highly polarized society where people from diverse political, economic and cultural backgrounds can come together in a setting where rational discussion and understanding of differing views can be prized and rewarded.

21.     Virtually all educators, scholars, and policy makers who have studied these issues have agreed that effective education for civic participation in the 21st century requires students to develop:

- substantive knowledge of our governmental structures and the functioning of democratic institutions;

- verbal, and media literacy skills;

- interpersonal and civic engagement skills that stem from involvement in extracurricular activities, and school-based and community-based experiential opportunities; and

- basic character values like responsibility, honesty, and self-discipline, as well as important democratic values like tolerance, respect for Due Process, and the rule of law, and support for the fundamental political institutions of our society.

22.     The Guardians of Democracy Report, issued by the Campaign for the Civic Mission

of the Schools chaired by former U.S. Supreme Court Justice Sandra Day O'Connor and former Congressman Lee Hamilton, validated these principles and set forth a series of "proven practices" for developing this civic knowledge, and these civic skills, experiences and values in all students. This report has been endorsed by a broad array of academic, civic, legal, and educational institutions, representing the full range of the political spectrum.

23.    Nevertheless, the state Defendants have, in their plans for public school reopening in September of 2020, failed to consider and implement these principles and proven practices and have failed to provide the named Plaintiffs and tens of thousands of other students in the City and State of New York with adequate opportunities to develop the civic knowledge, skills, experiences and values they need to function productively as civic participants.

24.    Plaintiffs allege that the failure to provide them and the numerous other students who are similarly situated with a plan, beginning in September of 2020, for adequate education for capable civic participation violates their constitutional rights under the Equal Protection, Privileges and Immunities and Due Process Clauses of the Fourteenth Amendment, the Sixth and Seventh Amendments and violates the guarantee that they will live in a state with a republican form of government under Article Four, Section Four of the United States Constitution.

25.    Additionally, the Executive Orders, together with the Defendants' failure to provide a plan, beginning in September of 2020, for adequate education, is a violation of: (i) the Contract Clause contained in Article I, Section 10, Clause I of the United States Constitution, and (ii) constitutes a *per se* Regulatory Taking in violation of the Fifth Amendment, which applies to State and Local government defendants herein via the Fourteenth Amendment Due Process Clause, specifically, in that mandatory remote learning requires parents of students in the public schools to now dedicate a portion of their homes to the government to be used for purposes of remote learning.

26.     The response by the Governor and Mayor to the Pandemic has been exemplary given the sudden and dire ramifications faced by the City and State of New York and its Citizens and Residents; however, the Governor's and Mayor's lack of adequate response on the issue of education neglects tens of thousands of parents which are the backbone of New York's economy, as well as their children who are students and who are the future of this nation, without any sort of viable plan for return to in-person learning in September of 2020.

27.     As well-intentioned as these Executive Orders are concerning the general public's health, safety and welfare, they have come at a steep price with respect to the complete and utter restraint on New Yorkers' right to a public education and equal educational opportunity without regard to race, ethnic background, religion, or sex, financial status, and/or citizenship status. This action challenges the constitutionality of Defendants' Orders to shutter the schools and replace in-person learning in September of 2020 with what has already been proven to be a failed system of alternative remote learning, blended learning, staggered learning and the like.

28.     Accordingly, Plaintiffs and the Class bring this action challenging the Constitutionality of the Executive Orders, which have deprived Plaintiffs and the Class of numerous rights and liberties under both The Constitution of the State of New York and The Constitution of the United States. In doing so, Plaintiffs and the Class seek:

(1)     equitable and injunctive relief to enjoin the enforcement of Defendants' Orders;

(2)     declaratory relief from this Court in declaring that Defendants' Orders violate:

    a.     the prohibition in the United States Constitution against Bills of Attainder and *ex post facto* laws; and

    b.     Plaintiffs' civil rights under:

        i.     42 U.S.C. Section 1983 of the Federal Civil Rights Act ("Section 1983");

        ii.     the Due Process, and Equal Protection Clauses of the 5th and 14th

Amendments to the United States Constitution;

iii.     the 6th, 7th, 9th, 10th, 13th and 14th Amendments to the United States Constitution;

iv.     Article I, Sections 1, 9, and 11 of the Constitution of the State of New York;

v.      Article III, Section 25 of the Constitution of the State of New York;

vi.     Article IV, Section 3 of the Constitution of the State of New York;

vii.    Article VII, Section 8 of the Constitution of the State of New York; and

viii.   Article XI, Section 1 of the Constitution of the State of New York.

(3)     damages under § 1983;

(4)     attorney's fees and costs for the work done by counsel for Plaintiffs and the Class in connection with this lawsuit in an amount according to proof; and

(5)     for such other and further relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

29.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights to Due Process and Equal Protection rights under the 5th, 6th, 7th, 9th, 10th, 13th and 14th Amendments to the United States Constitution; the Defendants' actions contrary to the prohibition in the United States Constitution against Bills of Attainder and *ex post facto* laws; the Jury Selection and Service Act, 28 U.S.C.§ 1861, and Article Four, Section Four of the United States Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201 and 2202; the requested injunctive relief and damages under 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983; and attorneys' fees and costs under 42 U.S.C. § 1988.

30.     The United States District Court for the Eastern District of New York is the

appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(2) because it is the District in which substantially all of the events giving rise to the claims occurred.

## THE PARTIES

31.    Representative Plaintiff NVARD SRABYAN is an individual residing in and domiciled within the City and State of New York and is the mother of Plaintiffs A.V. and M.V.

32.    Plaintiff A.V. is a student at P.S. 253, located at 601 Ocean View Avenue, Brooklyn, New York. He will begin 6th grade in September of 2020. He resides in and is domiciled within the City and State of New York. A.V. is an English Language Learner and receives English Language Learner services from P.S. 253.

33.    Plaintiff M.V. is a student at Rachel Carson High School for Coastal Studies, located at 521 West Ave, Brooklyn, New York. She will begin 12th grade in September of 2020. She resides in and is domiciled within the City and State of New York. M.V. is an English Language Learner and receives English Language Learner services from the High School.

34.    That at all times hereinafter mentioned, Defendant THE STATE OF NEW YORK ("NYS") was and still is a Municipal Corporation, duly organized and existing under and by virtue of the law of the State of New York.

35.    That at all times hereinafter mentioned, Defendant NEW YORK STATE EDUCATION DEPARTMENT ("NYSDOE") is and was a state agency within the State of New York.

36.    That at all times hereinafter mentioned, Defendant NYS owned, operated, maintained, managed, inspected, supervised and controlled NYSDOE.

37.    Defendant SHANNON TAHOE is the current Interim Commissioner of Education for NYSDOE and is being sued both in her personal and in her official capacity.

38.     Defendant ANDREW CUOMO (hereinafter "Cuomo" or the "Governor") is the current Governor of the State of New York and the individual who issued and signed the Orders at issue in this case. Governor Cuomo is being sued both in his personal and in his official capacity.

39.     That at all times hereinafter mentioned, Defendant THE CITY OF NEW YORK ("NYC") was and still is a Municipal Corporation, duly organized and existing under and by virtue of the law of the State of New York.

40.     Defendant THE NEW YORK CITY DEPARTMENT OF EDUCATION (hereinafter "NYCDOE") is a sub-division of NYC.

41.     That at all times hereinafter mentioned, defendant NYC owned, operated, maintained, managed, inspected, supervised and controlled NYCDOE.

42.     Defendant RICHARD A. CARRANZA is the Chancellor of NYCDOE and is being sued both in his personal and in his official capacity.

43.     Defendant BILL De BLASIO (hereinafter "De Blasio" or the "Mayor") is the current Mayor of NYC and the individual who directly manages and supervises the activities of Defendant NYCDOE. The Mayor is being sued both in his personal and in his official capacity.

44.     All Defendants are hereinafter collectively referred to as "Defendants."

## FACTUAL BACKGROUND

### I.   TIMELINE OF EVENTS REGARDING COVID-19 OUTBREAK IN NEW YORK

45.     On March 1, 2020, the State of New York confirmed its first case of COVID-19. On March 2, 2020, Governor Cuomo issued a mandate that required insurers to waive cost sharing associated with testing for COVID-19. On March 3, 2020, Governor Cuomo signed a $40 Million Dollar ($40,000,000.00) emergency management authorization for the NYS virus response which granted the Governor broad powers to use directives and executive orders.

46.    On March 7, 2020, Governor Cuomo issued the first of several COVID-19 related Executive Orders when he declared a State of Emergency. On March 11. 2020, the Governor, by executive order closed all New York City public schools.

47.    On March 14, 2020, NYS confirmed its first two (2) COVID-19 related deaths, as well as six hundred thirteen (613) positive cases. Governor Cuomo subsequently issued an executive order modifying election procedures and which suspended the candidate petitioning process for the June primary elections.

48.    On March 16, 2020, Governor Cuomo issued an executive order that closed all schools statewide. Additionally, and in partnership with the Governor of New Jersey, Governor Cuomo issued the first of several executive orders that implemented "Social Distancing" protocols across New York and New Jersey. This order also closed all in store dining, bars, movie theaters and casinos.

49.    On March 20, 2020, NYS confirmed an excess of 7,102 confirmed cases of COVID-19 and 46 total deaths. At that time, Governor Cuomo signed an executive order entitled "New York State on PAUSE" which closed all "non-essential businesses" statewide.

50.    New York State on PAUSE also banned all nonessential gatherings of any size, implemented social distancing of 6 feet or more and banned all contact recreational activities.

51.    New York State on PAUSE also established a 90-day moratorium on any residential or commercial evictions.

52.    By March 29, 2020 NYS had confirmed 59,513 COVID-19 cases and 981 COVID-19 related deaths.

53.    As hospitals were quickly becoming overrun, Governor Cuomo then extended the New York State on PAUSE Order.

54.    By April 13, 2020, NYS had at least 195,031 confirmed COVID-19 cases and

10,072 confirmed virus-related deaths. NYS, together with the States of New Jersey, Connecticut, Pennsylvania, Delaware, Massachusetts and Rhode Island announced a Seven-State Council to restore the economy and get citizens back to work.

55.    As of June 23, 2020, NYS has confirmed more than 388,000 COVID-19 cases and 30,000 deaths. Governor Cuomo has also extended Executive Order 202.28 until at least June 27, 2020.

56.    To date, there exists no Executive Order which provides for the reopening of schools for in-person learning full time as it had existed prior to the start of the COVID-19 pandemic.

57.    All public school students have already suffered and will continue to suffer as a result of the stifling effect that the Executive Orders have had on the public school system, and specifically, the effect that the Executive Orders have had on the ability of Plaintiff and the Class to have a public education and equal educational opportunity, which can only be obtained with full time in-person learning.

## II.   IMPACT OF COVID-19 ON THE PUBLIC SCHOOLS OF THE STATE OF NEW YORK

58.    The Education Trust–New York ("Ed Trust–NY") is a statewide education policy and advocacy organization focused first and foremost on doing right by New York's children and advocates for students, especially those whose needs and potential are often overlooked.

59.    Ed Trust–NY is affiliated with the national organization, The Education Trust, based in Washington, D.C.

60.    Global Strategy Group, LLC ("GSG") is an organization engaged in public affairs, communications, and research, with the purpose of advancing legislative, regulatory, and political goals.

61.    Between June 16, 2020 and June 22, 2020, GSG in partnership with Ed Trust–NY,

conducted an online survey among 800 parents of children in New York State public schools on the issue of Ongoing Education Needs for New York Families. The results of the survey are set forth in a memorandum annexed hereto as Exhibit "A", which outline in detail the following major points:

- Months after school closures, satisfaction with distance learning has decreased – driven by a large gap between the experiences of low-income families and higher-income families.

- At the root of parents' dissatisfaction with remote learning is a fear that their child will fall behind academically.

- Access to their child's teachers is viewed as an important area of improvement.

- Student experiences reveal ways the pandemic makes existing equity gaps even worse:

  ➢ Access to teachers: Black and Latino (52%) parents are less likely than White (57%) parents to say their child got regular live access to their teacher, such as live online lessons or phone/video calls, and parents of color are less likely (52%) to say they have been provided with regular contact with or access to their child's teacher compared to White parents (59%).

  ➢ Feedback on assignments: Parents with incomes over $100,000 per year are much more likely to report that their child has received regular feedback on assignments (60%) than parents with very low incomes (44%).

  ➢ Summer learning materials: Parents with very low incomes are also much less likely to say that they have been provided with summer learning materials for their child (23%) compared to parents with incomes over $100,000 (33%), though both figures remain low.

  ➢ Access to technology: Students from low-income backgrounds are less likely to have access to their own tablet, computer, or other device to participate in remote learning (77%) than higher-income students (84%).

  ➢ Access to reliable internet: Low-income (75%) and Latino students (78%) are much less likely to have access to fast and reliable internet compared to higher-income (88%) or White (85%) students.

  ➢ Food insecurity: 51% of parents from low-income communities, 51% of Latino parents, and 48% of Black parents are concerned about their child's access to meals and food this summer, compared to just 36% of higher-income parents and 36% of White parents. Overall, 1 in 3 parents (33%) and 40% of low-income parents have skipped or reduced the size or number of meals for themselves or their child as a result of the pandemic.

- Low-income families are hit hardest by school closures and distance learning.

- Months into school closures, there are still large gaps in supports for families that remain unaddressed.

- Looking ahead to the fall, academic concerns and a fear that their children have or will fall behind academically rise to the top.

- Parents prioritize providing additional support for students who have fallen behind and finding safe ways for children to attend school.

- Losing more learning time is an extremely high concern for parents. Losing even more learning time if schools have to close again during the next school year tops the list of potential concerns about returning in the fall (90% concerning overall, including 61% who say this is very concerning).

- Facing a steep economic crisis and with insufficient federal funding to support states and schools, parents want any budget cuts to be targeted so that they protect the students with the greatest needs, rather than implemented across-the-board.

## III.    PRACTICAL PROBLEMS ARISING OUT OF THE CURRENT PLANS FOR PUBLIC SCHOOL REOPENING IN SEPTEMBER OF 2020 INVOLVING PROPOSED <u>ALTERNATIVE LEARNING FORMATS</u>

62.    The Ed Trust–NY information offers some insight as to how remote learning in its current format is a failure, as well as how the proposed alternative learning formats planned for September of 2020 (in lieu of in-person full time learning) is doomed from the start.

63.    In addition to the Ed Trust–NY information, Plaintiffs and the Class have been able to identify numerous issues arising out of the day to day practicalities of the proposed alternative learning formats planned for September of 2020 (in lieu of in-person full time learning) which are set forth below as follows.

64.    Students in need of extra learning assistance and/or learning-disabled students are not similarly situated as students who do not require any assistance. The current proposed alternative learning schemes will result in disparate treatment for students in need of assistance and who will ultimately be deprived of their fundamental right to have an education experience equal to that of their peers who do not require extra assistance. This inevitable outcome is a result

of many factors, including, but not limited to:

- Current methods for remote learning are implemented on an ad hoc basis, and there currently exists no formalized standards for ensuring that students in need of extra learning assistance and/or learning-disabled students are given, via remote learning, the required level of attention previously received during pre-pandemic full time in-person instruction.

- There currently exist no formalized standards for training teachers to ensure that students in need of extra learning assistance and/or learning-disabled students are given, via remote learning, the required level of attention, and which was previously received during pre-pandemic full time in-person instruction.

- The in-person presence of a teacher (as opposed to remote learning) is crucial for students who are more naturally suited for learning by traditional standards of pedagogy, such as Joint Productive Activity which allows for conversation, which teaches language, meaning, and values in the context of immediate issues.

- Teaching and learning through "joint productive activity" is cross-cultural, typically human, and probably "hard-wired." This kind of "mentoring" and "learning in action" is characteristic of parents with very young children; of pre-school, graduate school, adult learning, school-to-work and service learning, on-the-job training — of all education, except the common K-12 tradition.

- In remote learning, there is ordinarily little joint activity from which common experiences emerge, and therefore no common context that allows students to develop common systems of understanding with the teacher and with one another. Joint activity between teacher and students helps create such a common context of experience within the school itself. This is especially important when the teacher and the students are not of the same background.

- The in-person presence of a teacher (as opposed to remote learning) is crucial for students who are more naturally suited for learning by traditional standards of pedagogy, such as language development and literacy, which is a fundamental competency necessary for school success. School knowledge, and thinking itself, are inseparable from language. Everyday social language, formal academic language, and subject matter lexicons are all critical for school success. Language development, which cannot be achieved effectively through remote learning, requires purposeful, deliberate conversation between teacher and students, and not through online drills and decontextualized rules simply posted online and 'dumped' on the student. Ways of using language that can only be achieved by in-person instruction include school discourse, such as ways of asking and answering questions and challenging claims.

- Students at risk of educational failure, particularly those of limited standard English proficiency, are often forgiven any academic challenges on the assumption that they are of limited ability, or they are forgiven any genuine assessment of progress because the assessment tools are inadequate. This is only amplified by the inadequacies of remote learning.

65.     For all students, regardless of whether they require extra learning assistance and/or are learning-disabled, the current proposed alternative learning schemes will result in disparate treatment as compared to their peers who have had, and will have (due to their residency in other states) a return to full time in-person learning in September of 2020. This outcome is a result of many factors, including, but not limited to:

- Loss of students' ability to socialize with one another in a manner which can only take place "face to face".

- The fact that remote learning, by its very nature, is prone to problems arising out of a lack of supervision during remote instruction which was previously insufficient during pre-pandemic full time in-person instruction. Put simply, at home, students are subject to in-home distractions. This issue is complicated when parents have multiple children which must be supervised at home during remote learning and is further complicated when there is a lack of adequate space for each student to have sufficient privacy to engage in their remote learning activities. Also, complicating this matter is the undue burden on parents who must now be present at home to supervise their children for remote learning and are now unable to work outside of the home.

- Current methods for remote learning are implemented on an ad hoc basis, and there currently exists no formalized standards for ensuring that technology is adequate enough to address hearing and vision requirements. Poor technological resources result in students being unable to hear and understand during video instruction, and also result in the inability for teachers to address students' mistakes in real time during video instruction.

- Remote learning, by its very nature, is prone to problems arising out of accountability and the possibility for cheating and cutting of corners by parents, siblings, and others who perform the work in place of the student.

- Remote learning, by its very nature, requires the presence of a parent at home in order to supervise their children, thus depriving the parent of the ability to engage in employment outside of the home.

- While pre-pandemic full time in-person education allowed teachers and instructors the opportunity to observe students in-person with regard to their safety, health, welfare and well-being, and pick up on signs of domestic abuse and/or neglect, remote learning deprives teachers and instructors of the ability to ascertain the student's status, location, or any other red flags giving rise to the student being in jeopardy with regard to their safety, health, welfare and well-being.

- The current proposed alternative learning schemes also result in students being deprived of traditional physical education activities, music instruction, and outdoor recess.

## ADDITIONAL FACTUAL BACKGROUND

66.    American democracy today is facing severe challenges: the electorate is highly polarized, few people engage in conversation with individuals holding opposing views, and there is widespread acceptance and circulation of one-sided and erroneous information. Moreover, the proportion of eligible voters who actually vote is substantially lower than in most other developed countries, and the number of citizens who actively participate in local community activities has dramatically declined over the past half century.

67.    These trends indicate that the schools in recent decades have failed to carry out their core responsibility to prepare young people to be good citizens, civically engaged, capable of safeguarding America's democratic values and our democratic institutions. As former U.S. Supreme Court Justice Sandra Day O'Connor has stated, "*We are failing to impart to today's students the information and skills they need to be responsible citizens*." Foreword to Campaign for Civic Mission of the Schools, No Excuse: Eleven Schools and Districts That Make Preparing for Citizenship a Priority and How Others Can Do It Too, 5 (2010).

68.    The nation's founders believed that the profound experiment in republican government that they were initiating depended on citizens' ability to participate in public life and to exhibit civic virtues such as mutual respect and prudent judgment. For the new republic to be maintained, the founding fathers believed that the role of the schools would be critical and that, as John Adams put it: "*The education of a nation instead of being confined to a few schools and universities for the instruction of the few, must become the national care and expense for the formation of the many*." David McCullough, John Adams, Simon & Schuster (2001).

69.    In the nineteenth century, a "common school" system -- i.e. the American public school system -- was established precisely to ensure that all students, rich or poor, native or immigrant, could be educated together in a common environment in which civic knowledge and

civic values could be inculcated.

70.     Over the past half century, however, most American public schools, including most schools in New York, have substantially neglected their responsibility to prepare students for civic participation. Policy makers and educators, including the Defendants in this case, have downgraded the teaching of social studies and civics, focusing in recent decades on basic reading and math instruction and on the economic value of education to individual students. They have also substantially neglected professional development of teachers in civics education. This neglect is now substantially increased as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

71.     Many young people today are apathetic regarding basic democratic values. A recent study found that when asked to rate on a scale of 1 to 10 how "essential" it is for them "to live in a democracy," 72% of those born before World War II chose 10, the highest value, but among those born after 1980, only about 30% accorded maximal importance to living in a democracy. This study also found that in 2011, 24% of those born in the U.S. after 1980 (then in their late teens or early twenties) considered democracy to be a 'bad' or 'very bad' way of running the country.  Roberto Stefan Foa & Yascha Mounk, The Democratic Disconnect, 27 J. DEMOCRACY 5, 7-8 (2016).,

https://www.journalofdemocracy.org/sites/default/files/Foa%26Mounk-27-3.pdf

72.     Most social studies classes in New York do not discuss social problems and controversial ideas, and opportunities for students to participate in extracurricular activities, service learning, and actual and simulated political experiences are inadequate and tend to be cut back or eliminated in times of fiscal constraint. This inadequacy is now substantially increased as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

73.     Most public schools in the United States today, including most schools in New York, have also failed to help students apply critical thinking to their use of new media. The Stanford History Education Group recently administered a series of assessments that gauge "civic online reasoning" to approximately eight thousand secondary school and college students across twelve states. In one of these exercises, the researchers sent high school and college students to a website that purported to be a fair broker of information on the relationship between minimum-wage policy and employment rates, but, in fact, it was a front for a public relations firm that poses as a think tank. Only 9% of high school students taking Advanced Placement history courses were able to see through the language used on site to determine that its reporting was biased. Among college students the results were actually worse: 93% of students were fooled. Most students never moved beyond the site itself. Stanford History Educ. Grp., Evaluating Information: The Cornerstone of Civic Online Reasoning 4 (2016).

74.     The ability of the schools to carry out their historical civic preparation role has been further undermined by the disparities in opportunities for effective civic preparation that are available in many schools with inadequate educational resources, and which now has been worsened due to current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning). This has resulted in and will worsen a large "civic empowerment gap" for many African-American and Latino students and for many students from low-income families. For example, on the 2014 NAEP 8th Grade test in civics, while 32% of White eighth graders performed at or above the proficient level, only 9% of Black students and 12% of Latino students did the same.

75.     The results of the schools' substantial failure to prepare students for civic participation are apparent. In 1971, when bi-partisan super-majorities enacted the 26th Amendment to the U.S. Constitution that gave 18-year-olds the right to vote, there was an expectation that

young people would enthusiastically take advantage of this important constitutional opportunity. However, fewer of America's youngest voters have, in fact, exercised their right to vote over the past 50 years, and their voting rates have substantially declined over time.  In the 2016 presidential election, only 61.4% of Americans eligible to vote chose to do so, and among younger voters, aged 18-29, the voter turn-out was only 46.1%. Thomas File, U. S. Census Bureau, Voting in America: A Look at the 2016 Presidential Election, available at

https://www.census.gov/newsroom/blogs/randomsamplings/2017/05/voting_in_america.html.

76.    Americans rank 139th in voter participation out of 172 world democracies. McCormick Tribune Foundation, Civic Engagement in Our Democracy 6 (2007), available at http://documents.mccormickfoundation.org/publications/civicdisengagement.pdf.

77.    There has also been a substantial decline in knowledge and interest in public affairs. Between 1972 and 2008, the share of people saying they follow "what's going on in government and public affairs" declined from 36% to 26%. Sen. Mike Lee, What We Do Together: The State of Associational Life in America 40 (2017).

78.    Participation in local civic activities has also plummeted, especially among young people. "[M]embers of the generation born in the 1920's belong to almost twice as many civic associations. . . .The grandparents are. . . twice as likely to work on a community project . . . they are almost three times as likely to read a daily newspaper. (75% vs. 25%)." Robert Putnam, Bowling Alone: The Collapse and Revival of American Community 254 (2000).

79.    Volunteering among high school and college students nationally has declined since the early 2000's and has remained relatively low and stagnant for the last decade. This decline will now substantially be increased as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

## **LEGAL BACKGROUND**

80.    In 1973, the U.S. Supreme Court, held, by a 5–4 vote, that a pattern of substantial disparities in the amount of education funding available to local school districts in Texas was not unconstitutional.  San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973). The Court held that education is not a "fundamental interest" under the federal Constitution, Id. at 29, and, therefore, Plaintiffs were not entitled to strict scrutiny of their claim. Despite the acknowledged importance of education, the majority held that education was not a fundamental interest because "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause." Id. at 30. Applying the rational relationship standard, the Court upheld the Texas education finance system despite its inequities after determining that local control of education was a rational state interest.

81.    Justice Thurgood Marshall, in a strong dissent, took issue with this position. He argued that although education is nowhere directly mentioned in the Constitution, education must be deemed a fundamental interest because of "the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values." Id. at 111 (Marshall, J, dissenting).  Specifically, he stressed the importance of education for exercising First Amendment rights, "both as a source and as a receiver of information and ideas," and for exercising the constitutional right to vote and to participate in the political process. Id. at 113– 14.  See also Id. at 63 (Brennan, J., dissenting).

82.    Justice Powell, writing for the majority, accepted the dissenters' basic perspective. After summarizing the arguments on this point, he stated:

> "We need not dispute any of these propositions. The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote…"

However, he also held that the Court did not have to consider this issue in the case at bar because:

> "Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. . . . [In the present case] no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." Id. at 36-37.

83.     In short, then, in Rodriguez, all of the Justices indicated that some basic level of education may be necessary for students to obtain the essential knowledge and skills they need for "full participation in the political process." Because Plaintiffs in that case had not presented specific evidence on what that basic level of education should be and whether the schools attended by the Plaintiff children were providing that amount of education, the majority determined that it did not need to decide "what identifiable quantum of education" students might need to exercise their First and Fifteenth Amendment rights.

84.     A number of years later, the Court specifically reiterated that it still had not definitively settled the question of whether a minimally adequate education is a fundamental interest and whether a statute alleged to infringe that right should be accorded heightened Equal Protection review.  Papasan v. Allain, 478 U.S. 265, 284 (1986).

85.     The Supreme Court has also underscored the significance of the constitutional right to a trial by jury in both criminal and civil cases, Duncan v. Louisiana, 391 U.S. 145 (1968), and the importance of the right of all citizens to serve as jurors: as Justice Kennedy stated for the Court in Powers v. Ohio, 499 U.S. 400, 407 (1991), "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."

86.     Since the Supreme Court issued its *Rodriguez* decision in 1973, claims of inequities

in education funding have been litigated in state courts in 47 of the 50 states. In approximately 60% of these cases, the state courts have held that there is a right to an "adequate," "thorough and efficient" or "sound basic" education under their state constitutions, and in many of these cases, these courts have held that the states must remedy these inequities. In approximately 40% of the cases, the state courts have held that these adequacy and equity issues are not justiciable or that Plaintiffs had not presented sufficient evidence of inequity or inadequacy to justify relief.

87.     These state cases constitute a veritable "laboratory of the states" in which the state courts have developed a wide range of legal doctrines and remedies regarding educational adequacy and equity in school funding.

88.     Thirty-two of the highest state courts have also specifically held that the primary purpose or a primary purpose of public education is to prepare students to be capable citizens. The highest state courts in the other 18 states have not spoken to this issue; no highest state court has contested the validity of the proposition that a prime purpose of education is to prepare students for capable civic participation. In none of these cases, however, have the state courts issued orders requiring state officials to take any action to ensure that the schools are, in fact, adequately carrying out their constitutional responsibilities to prepare students to function productively as civic participants.

89.     Declaratory and injunctive relief is needed at this time from this Court in order to remedy on a uniform basis the existing deficiencies (which will be worsened as a result of the current proposed alternative learning schemes planned for September of 2020, in lieu of in-person full time learning) in preparing students for civic preparation, and the failure of schools in New York to carry out their responsibilities under the U.S. Constitution to provide all students meaningful opportunities to become capable civic participants.

## SPECIFIC ALLEGATIONS

**Civic Knowledge**

90.    In the mid-twentieth century, three civics-related courses were common in American high schools: civics, problems of democracy, and American government. The traditional civics course emphasized the rights and responsibilities of citizens and the ways that they could work together and relate to government. Courses in "problems of democracy" involved discussions of public policy issues. The government class described and analyzed governmental institutions and how they function in a democratic society.

91.    Upon information and belief, today, students in New York are not required to take any courses in civics. Although some high schools in relatively affluent districts do offer a civics course as an elective, on information and belief, the majority of schools in New York do not. These deficiencies will be worsened as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

92.    The National Assessment Governing Board, the division of the U.S. Department of Education that oversees the National Assessment of Educational Progress (NAEP), has delineated what it considers to be the key elements of civic education. It has published a "framework" that identifies five major areas of civic knowledge covering America's political institutions, political values, and role in international politics:

- What are civic life, politics, and government?

- What are the foundations of the American political system?

- How does the government established by the Constitution embody the purposes, values, and principles of American democracy?

- What is the relationship of the United States to other nations and to world affairs?

- What are the roles of citizens in American democracy?

Nat'l Assessment Governing Bd., Civics Framework for the National Assessment of Educational Progress 16 (2014).

93.     While New York's educational accountability system focuses on schools' performance in reading, math and science, it neglects monitoring and accountability regarding civics, history, social studies, and economics. These deficiencies will be worsened as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

94.     Students with special education needs and/or need for extra assistance including Plaintiffs and the Class, and who attend schools in the New York Public School system do not receive adequate instruction in history, American government and civics or adequate extracurricular experiences geared to their special learning needs that will prepare them to function productively as civic participants as adults. This inadequacy will be worsened as a result of the current proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

95.     A democratic culture requires citizens to engage substantially in "democratic deliberation," an approach to political conflict and problem solving that emphasizes critical reasoning, thoughtful discussion, and respect for opinions with which one may disagree.

96.     Developing skills for deliberative democracy requires exposing students to controversial ideas *in the classroom*. The teaching of controversial subjects in a nonpartisan manner instills in students a sense of the complexity of issues, an exposure to positions different from those the students are likely to encounter at home or among friends, and a concept of how respectful discussions about these issues with those who hold different views can take place. It also emphasizes the importance of accurate facts, since students cannot meaningfully engage in political discussions without an agreed factual basis to which competing arguments and values can

relate.

97.     Because respectful discussions on controversial subjects have become substantially less prevalent in our highly polarized society, it is especially important that students are instructed effectively in the purposes and methods of democratic deliberation while they are in school. On information and belief, the majority of middle schools and high schools in New York, however, do not even attempt to promote active classroom discussion of controversial topics and do not, in fact, provide effective instruction in democratic deliberation.

98.     Widespread use of the internet and social media present both major challenges and major opportunities for educators seeking to develop critical reasoning and democratic deliberation skills in students. On the one hand, the digital age has the potential to create a dynamic new public square that motivates young people to engage more deeply with political issues and to develop sharply honed research and deliberative skills. On the other hand, the internet and social media can make it more difficult to motivate and equip students for civic participation if students use these tools primarily for socializing, entertainment and consumer pursuits, and if they do not understand how facts and opinions can be manipulated and misrepresented on the internet and social media. Absent a return to in-person full time learning in September of 2020, the pitfalls of internet and social media present an even greater threat to students being unable to understand how facts and opinions can be manipulated and misrepresented on the internet and social media.

99.     The Plaintiffs and the Class attend schools that have out-of-date computers in inadequate numbers to sufficiently provide access to critical educational opportunities necessary to develop the skills for internet and media literacy. The teachers and instructors at said schools lack the adequate technological resources to provide access to critical educational opportunities necessary to develop the skills for internet and media literacy.

100.     Few of the schools that  Plaintiffs have attended have the necessary databases for

appropriate research necessary for civic preparedness.

101.    On information and belief, most teachers in New York have had no training in teaching media literacy skills and most schools in New York do not have on staff sufficient skilled library media specialists, who are the information specialists best equipped to provide the full range of online information sources and to instruct students in media literacy skills that students need for civic participation.

**Civic Integration**

102.    In our highly polarized society, schools continue to be among the only places where people from diverse political and social backgrounds can come together in a setting where values of tolerance and respect for individuals from differing backgrounds continue to be prized and where a democratic community that motivates individuals with differing social, cultural and political views to develop mutual respect and trust can be developed effectively.

103.    This "civic integration" role was a prime motivation for the founding of "common schools" in the nineteenth century, and the integrative role of the schools has taken on even greater significance now in the twenty-first century. Civic integration does not require racial or socio-economic quotas, or mandatory school assignments. It does, however, call upon public officials, policy makers and educators to understand, promote and take advantage of the demographic trends that can support and increase civic integration in the schools.

104.    For civic integration purposes, "diversity" includes racial, ethnic, religious, and socio-economic backgrounds, linguistic and disability conditions, gender, sexual orientation and ideological perspectives. Civic integration means taking appropriate steps, consistent with the requirements of existing federal law, to increase the full range of diversity in the schools throughout the state to the maximum extent feasible and utilizing that diversity to develop a

communal ethos in each school that will enhance the civic awareness and civic values of all students.

105.     The state Defendants have failed, in their plans for proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning) to account for the need for effective civic integration.

## CLASS ACTION ALLEGATIONS

106.     The individual named Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 (b), Federal Rules of Civil Procedure, on behalf of all other persons similarly situated. The Class is composed of all students attending public K-12 schools in the city and state of New York pursuant to the state's compulsory attendance requirements who are not receiving a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, to participate effectively and intelligently in our open political system and to function productively as civic participants due to some or all of the Defendants' actions, omissions, laws, policies and practices, as described in this complaint, including Defendants' fatally flawed proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

**Numerosity**

107.     The Class is so numerous that individual joinder of all members is impracticable. The Class as defined numbers thousands of persons but the precise number is within the knowledge of Defendants and its specific formulation must await discovery and hearing. The state Defendants have acted or refused to act on grounds that apply generally to the Class, so that final declaratory relief or corresponding injunctive relief is appropriate respecting the Class as a whole.

108.    It would be impractical to join the Plaintiff Class members individually and there

is no need for this Court to do so in order to grant the relief sought in this action.


**Common Questions of Law**

109.    This case raises questions of law and fact common to all members of the since the

Defendants have acted or refused to act on grounds that apply generally to the Class, so that final

declaratory relief or corresponding injunctive relief is appropriate respecting the class as a whole.

Common questions of law and fact include, but are not limited to:

a)    Whether because of Defendants' actions, omissions, laws, policies and practices, the named Plaintiffs and similarly situated students throughout New York are being denied a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, to participate effectively and intelligently in our open political system and to function productively as civic participants;

b)    Whether Defendants have failed to enact appropriate laws, regulations, standards, and to ensure adequate resources, guidance and accountability systems to provide the named Plaintiffs and similarly situated students throughout the state appropriate courses, assessments, instruction, experiential opportunities and extracurricular activities that are needed to provide them the civic knowledge, civic skills, civic experiences and civic values that that are necessary and appropriate to prepare them for capable citizenship;

c)    Whether Defendants have failed to ensure that teachers throughout the state are sufficiently trained to provide competent instruction in all areas of civic preparation;

d)    Whether sufficient and adequate programs for bilingual and ESL programs for English language learners exist in all schools attended by English language learners in the state;

e)    Whether Defendants' actions, omissions, laws, policies and practices, as described in this complaint violate the rights of the named Plaintiffs and the members of the class under the Fourteenth Amendment, the Sixth and Seventh Amendments and Article Four, Section Four of the Constitution of the United States.

**Typicality and Adequacy**

110.    The claims of the individual Plaintiffs are typical of the claims of the Class as a whole. The named  Plaintiffs all attend schools in various parts of the state that are not providing them a meaningful opportunity to obtain an education adequate to prepare them for capable citizenship. The representative parties will fairly and adequately protect the interests of the Class. Plaintiffs are represented by experienced counsel who will adequately represent the interests of the Class.

111.    Representative Plaintiffs are interested in pursuing this matter to completion with the intent on a proper and fair outcome for all others similarly situated.

112.    Representative Plaintiffs hold no adverse interest or conflict with any member of the Plaintiff Class entitled to relief sought herein.

113.    Counsel who has been selected by the Representative Plaintiffs has no interest to or in conflict with that of any individual who might be entitled to the relief sought herein.

**Superiority**

114.    A Class action is superior to all other available methods as it will ensure fair and efficient adjudication of this matter.

115.    Counsel and representative Plaintiffs are not aware of any difficulty that would prevent proper management of this action or maintenance of a Class Action.

116.    A Class Action is appropriate and necessary in this case because prosecution of separate actions by individual members of the class would create a substantial risk of inconsistent or varying adjudications with respect to the operation of education programs in New York and would preclude a necessary coordinated structural solution to the common problems. Furthermore, Class Action designation is necessary to avoid possible problems of mootness if the course of this

litigation should extend over any appreciable length of time and the individual Plaintiffs should become ineligible for educational services by reason of age, change of residence, or other circumstances, or if defendants should undertake to meet the educational needs of the named Plaintiffs, without effectively eliminating their systematic violations of law and without, therefore, remedying the injuries suffered by numerous unnamed members of the Plaintiff class.

## FIRST CLAIM FOR RELIEF
**Violation of the Fourteenth Amendment Procedural Due Process Clause and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

117.    Plaintiffs reallege and incorporates by reference all preceding paragraphs as if they were set forth again herein.

118.    Plaintiffs assert that Defendants have engaged in behavior that violated the right to Procedural Due Process.

119.    Defendants' actions have deprived the Plaintiffs of their property rights, specifically their right to work for a living and generate income. The proposed alternative learning schemes planned for September of 2020 fail to account for parents who are engaged in their employment while at the same time, their children are engaged in "remote" learning at home and require supervision. Procedural Due Process affords the rights to notice and an opportunity to be heard when the State deprives an individual of fundamental property rights.

120.    No remedies or hearings of any kind are available to the Plaintiffs to address the loss of compensation. No end of the losses is in sight.

121.    Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard." Karpova v. Snow, 497 F.3d 262, 270 (2d Cir. 2007).

122.    Remote learning schemes that resulted after the issuance of the Executive Orders, together with the proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning) have created an irreparable economic loss that is ongoing.

123.    Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by depriving the individual named Plaintiffs and other members of the Plaintiff Class of a quality education. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes are deficient for a multitude of reasons already set forth herein, and include but are not limited to the following: insufficient instruction to students which can only be remedied by full time in person learning; insufficient technology for alternative learning schemes to be fruitful (e.g. no uniform technology making it impossible to listen to lectures because of terrible quality, lighting, and sound, poor internet connection); insufficient training for instructors and teachers to adequately prepare them to be effective educators via alternative learning schemes; insufficient personal interaction between students and teachers; inability by instructors and teachers to observe students who cheat, parents who cut corners and do the work on the students' behalf; and the additional burden on educators who now have to record lectures, prepare new lesson plans, become familiar with new technology and ultimately turn their homes into offices and classrooms at the expense of their families.

124.    Defendants' actions have additionally compromised the security, welfare and well-being of students. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes deprive educators of the ability to observe students in person and make assessments as to their health and welfare, domestic situation (and whether or not domestic abuse is an issue), as well as whether or not students are receiving sufficient nutrition. For students, including Plaintiffs and the Class, meals at school are a major part of their nutritional intake which they will now be deprived of.

125.    Defendants' actions have further deprived Plaintiffs and the Class of physical activities in school and basic development of social skills via person-to-person interaction. In or about July 7, 2020, the First Lady, Melania Trump, restated the harm to Plaintiffs and the Class when she stated unequivocally and unambiguously as follows: "*When children are out of school, they're missing more than just stuff in the classroom. They're missing the laughter of their friends, learning from their teachers and the joy of recess and play.*"

126.    In-person classroom interaction is an essential part of children's mental development, which includes  Plaintiffs and the Class. This has been stated unequivocally and unambiguously by defendants via the Council on Children and Families ("CCF"), which coordinates New York's health, education and human services systems as a means to provide more effective systems of care for children and families.

127.    The CCF has published guidance entitled: Interactions and Instruction in Prekindergarten through 3rd Grade: Building a Strong Foundation for the Common Core Learning Standards. This guidance can be found at the following website hosted by defendants: https://www.ccf.ny.gov/files/9615/2086/8842/interactionsSixPageWeb.pdf

128.    This guidance states as follows:

> "*Because children learn best when they have rich interactions, early childhood teachers and caregivers have a responsibility to build nurturing and stable relationships with each child in their care. To do so, they must have and model empathy, respect, and caring throughout their daily activities. When those strong relationships are established, children will learn when teachers present them with new ideas and abilities that are just beyond their current knowledge base and when they have many hands-on opportunities to practice their new skills. These learning opportunities occur naturally during playful learning in an early childhood education setting and project-based learning in the elementary grades. The learning process is the same – child-driven hands-on opportunities to work with peers as they solve problems, test their ideas, invent, create, and grow.*"

129.    This guidance further states as follows:

> "*In kindergarten, many children have their first experience with public school, which can shape lifelong attitudes toward school. It is especially important for teachers to support children's approaches toward learning: their attention, emotional regulation, flexibility, persistence, interests, and motivation to learn. 7 Children at this age still vary dramatically in their development and there is also a wide age range in many kindergarten classrooms. Thus, effective kindergarten teachers must be highly skilled at individualizing interactions and differentiating instruction*."

130.    Plaintiffs and the Class include taxpayers whose tax payments are paid for purposes funding education in the City and State of New York, which includes monies allocated towards the funding of full time in person learning in public schools. By implementing proposed remote learning, staggered learning, blended learning and all other proposed alternative learning schemes in place for September of 2020, Plaintiffs and the Class will be deprived of the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

131.    By virtue of the fact that Plaintiffs and the Class have been deprived of their property rights, specifically their right to work for a living and generate income, Plaintiffs and the Class will be deprived of the ability to further provide monies towards tax revenues dedicated to the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

132.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## SECOND CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment Substantive Due Process Clause and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)

133.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

134.    Plaintiffs and the Class assert that Defendants have engaged in behavior that violated the right to Substantive Due Process. This substantive guarantee is intended to preclude State and Local governments from engaging in conduct that deprives individuals of life, liberty and property.

135.    Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by denying the named Plaintiffs and other members of the Plaintiff Class their fundamental substantive right to a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

136.    Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by compelling the individual named  Plaintiffs and other members of the  Plaintiff class to attend public schools but failing to provide them while in school a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

137.    Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by depriving the individual named Plaintiffs and other members of the Plaintiff class of a quality education. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes are deficient for a multitude of reasons already set forth herein, and include but are not limited to the following: insufficient instruction to students which can only be remedied by full time in person learning; insufficient technology for alternative learning schemes to be fruitful (e.g. no uniform technology making it impossible to listen to

lectures because of terrible quality, lighting, and sound, poor internet connection); insufficient training for instructors and teachers to adequately prepare them to be effective educators via alternative learning schemes; insufficient personal interaction between students and teachers; inability by instructors and teachers to observe students who cheat, parents who cut corners and do the work on the students' behalf; and the additional burden on educators who now have to record lectures, prepare new lesson plans, become familiar with new technology and ultimately turn their homes into offices and classrooms at the expense of their families.

138.    Defendants' actions have additionally compromised the security, welfare and well-being of students. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes deprive educators of the ability to observe students in person and make assessments as to their health and welfare, domestic situation (and whether or not domestic abuse is an issue), as well as whether or not students are receiving sufficient nutrition. For students, including Plaintiffs and the Class, meals at school are a major part of their nutritional intake which they will now be deprived of.

139.    Defendants' actions have further deprived Plaintiffs and the Class of physical activities in school and basic development of social skills via person-to-person interaction. In or about July 7, 2020, the First Lady, Melania Trump, restated the harm to Plaintiffs and the Class when she stated unequivocally and unambiguously as follows: "*When children are out of school, they're missing more than just stuff in the classroom. They're missing the laughter of their friends, learning from their teachers and the joy of recess and play*."

140.    In-person classroom interaction is an essential part of children's mental development, which includes Plaintiffs and the Class. This has been stated unequivocally and unambiguously by defendants via the Council on Children and Families ("CCF"), which

coordinates New York's health, education and human services systems as a means to provide more effective systems of care for children and families.

141.    The CCF has published guidance entitled: Interactions and Instruction in Prekindergarten through 3rd Grade: Building a Strong Foundation for the Common Core Learning Standards. This guidance can be found at the following website hosted by defendants: https://www.ccf.ny.gov/files/9615/2086/8842/interactionsSixPageWeb.pdf

142.    This guidance states as follows:

> *"Because children learn best when they have rich interactions, early childhood teachers and caregivers have a responsibility to build nurturing and stable relationships with each child in their care. To do so, they must have and model empathy, respect, and caring throughout their daily activities. When those strong relationships are established, children will learn when teachers present them with new ideas and abilities that are just beyond their current knowledge base and when they have many hands-on opportunities to practice their new skills. These learning opportunities occur naturally during playful learning in an early childhood education setting and project-based learning in the elementary grades. The learning process is the same – child-driven hands-on opportunities to work with peers as they solve problems, test their ideas, invent, create, and grow."*

143.    This guidance further states as follows:

> "*In kindergarten, many children have their first experience with public school, which can shape lifelong attitudes toward school. It is especially important for teachers to support children's approaches toward learning: their attention, emotional regulation, flexibility, persistence, interests, and motivation to learn. 7 Children at this age still vary dramatically in their development and there is also a wide age range in many kindergarten classrooms. Thus, effective kindergarten teachers must be highly skilled at individualizing interactions and differentiating instruction*."

144.    Plaintiffs and the Class include taxpayers whose tax payments are paid for purposes funding education in the City and State of New York, which includes monies allocated towards the funding of full time in person learning in public schools. By implementing proposed remote learning, staggered learning, blended learning and all other proposed alternative learning

schemes in place for September of 2020, Plaintiffs and the Class will be deprived of the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

145.    By virtue of the fact that Plaintiffs and the Class have been deprived of their property rights, specifically their right to work for a living and generate income, Plaintiffs and the Class will be deprived of the ability to further provide monies towards tax revenues dedicated to the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

**146.**    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

### THIRD CLAIM FOR RELIEF
**Violation of the Fourteenth Amendment Equal Protection Clause and
the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

147.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

148.    Defendants have violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by denying to the named Plaintiffs and other members of the Plaintiff Class their fundamental interest in receiving a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

149.    This Court has held that "The Equal Protection Clause directs state actors to treat similarly situated people alike. To prove an Equal Protection violation, claimants must prove

purposeful discrimination, directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). In other words, "[t]o prove a violation of the Equal Protection Clause . . . a Plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Id.

150.     Defendants have violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by denying the named Plaintiffs and other members of the Plaintiff Class a meaningful opportunity to obtain a basic education necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, without demonstrating any substantial state interest for doing so.

151.     Defendants have violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, by denying the named Plaintiffs and other members of the Plaintiff Class a meaningful opportunity to obtain the degree of education necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, without demonstrating any rational relationship to any legitimate state reason for doing so.

152.     By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## FOURTH CLAIM FOR RELIEF
### Violation of the Takings Clause (Regulatory Taking) of the Fifth Amendment of the U.S. Constitution and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)

153.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

154.     Plaintiffs and the Class assert that Defendants have engaged in regulatory taking that violated the Takings Clause of the Constitution.

155.     "That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of legislative body, without restraint. The fundamental maxims of a free government seem to require, that rights of personal liberty and private property should be held sacred." Wilkinson v. Leland, 27 U.S. 627, 657 (1829) (Story, J.).

156.     The Takings Clause of the Fifth Amendment applies to the states through the Fourteenth Amendment and provides that no "private property [shall] be taken for public use, without just compensation." **U.S. Const. Amend. V**; Kelo v. Cty of New London, 545 U.S. 469, 496 (2005). To state such a claim, Plaintiffs "must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that [property] interest by the government for public use, and (3) that they were not afforded just compensation." Ganci v. N.Y.C. Transit Auth., 420 F.Supp.2d 190, 195 (S.D.N.Y.), aff'd, 163 F. App'x 7 (2d Cir. 2005).

157.     In this case application of the Takings Clause is proper. Plaintiffs and the Class have a Constitutionally protected ownership in and to their properties. This right includes the Plaintiffs' and the Class' right to the compensation therefrom. Given the proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning), parents are now forced to allocate a portion of their residences for the purposes of "remote" learning. The Plaintiffs and the Class are being deprived of this right to their property interest in favor of the public's use. The  Plaintiffs and the Class have not been afforded any sort of compensation or

relief for this deprivation.

158.    Under the Takings Clause of the Fifth Amendment the rescission of contractually guaranteed wage increases is considered a regulatory taking. Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006), (citing Penn Cent. Transp. Co v. City of New York, 438 U.S. 104, 124 (1978)). Three factors are weighed to determine whether interference with property rises to the level of a regulatory taking: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Id. at 375 (quoting Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 224-25 (1986)).

159.    Similar to the ruling in Buffalo, Governor Cuomo's issuance of the Executive Order(s) and proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning), including the already implemented and now proposed "remote" learning at home constitutes a classic regulatory taking.

160.    Through the Executive Order(s) and proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning), Defendants are depriving property owners of their fundamental property rights, including their rights to the interest in their properties, to just compensation and to Due Process.

161.    The issuance of the Executive Orders and each subsequent extension thereof constitutes a regulatory taking and Due Process violations.

162.    In addition to a regulatory taking, Defendants have violated the Fifth Amendment of the U.S. Constitution by depriving the individual named  Plaintiffs and other members of the Plaintiff Class of a quality education. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes are deficient for a multitude of reasons already set forth herein, and include but are not limited to the following: insufficient instruction to students

which can only be remedied by full time in person learning; insufficient technology for alternative learning schemes to be fruitful (e.g. no uniform technology making it impossible to listen to lectures because of terrible quality, lighting, and sound, poor internet connection); insufficient training for instructors and teachers to adequately prepare them to be effective educators via alternative learning schemes; insufficient personal interaction between students and teachers; inability by instructors and teachers to observe students who cheat, parents who cut corners and do the work on the students' behalf; and the additional burden on educators who now have to record lectures, prepare new lesson plans, become familiar with new technology and ultimately turn their homes into offices and classrooms at the expense of their families.

163.    Defendants' actions have additionally compromised the security, welfare and well-being of students. Remote learning, staggered learning, blended learning and all other proposed alternative learning schemes deprive educators of the ability to observe students in person and make assessments as to their health and welfare, domestic situation (and whether or not domestic abuse is an issue), as well as whether or not students are receiving sufficient nutrition. For students, including Plaintiffs and the Class, meals at school are a major part of their nutritional intake which they will now be deprived of.

164.    Defendants' actions have further deprived Plaintiffs and the Class of physical activities in school and basic development of social skills via person-to-person interaction. In or about July 7, 2020, the First Lady, Melania Trump, restated the harm to Plaintiffs and the Class when she stated unequivocally and unambiguously as follows: "*When children are out of school, they're missing more than just stuff in the classroom. They're missing the laughter of their friends, learning from their teachers and the joy of recess and play*."

165.    In-person classroom interaction is an essential part of children's mental development, which includes Plaintiffs and the Class. This has been stated unequivocally and

unambiguously by Defendants via the Council on Children and Families ("CCF"), which coordinates New York's health, education and human services systems as a means to provide more effective systems of care for children and families.

166.    The CCF has published guidance entitled: Interactions and Instruction in Prekindergarten through 3rd Grade: Building a Strong Foundation for the Common Core Learning Standards. This guidance can be found at the following website hosted by defendants: https://www.ccf.ny.gov/files/9615/2086/8842/interactionsSixPageWeb.pdf

167.    This guidance states as follows:

> "*Because children learn best when they have rich interactions, early childhood teachers and caregivers have a responsibility to build nurturing and stable relationships with each child in their care. To do so, they must have and model empathy, respect, and caring throughout their daily activities. When those strong relationships are established, children will learn when teachers present them with new ideas and abilities that are just beyond their current knowledge base and when they have many hands-on opportunities to practice their new skills. These learning opportunities occur naturally during playful learning in an early childhood education setting and project-based learning in the elementary grades. The learning process is the same – child-driven hands-on opportunities to work with peers as they solve problems, test their ideas, invent, create, and grow*."

168.    This guidance further states as follows:

> "*In kindergarten, many children have their first experience with public school, which can shape lifelong attitudes toward school. It is especially important for teachers to support children's approaches toward learning: their attention, emotional regulation, flexibility, persistence, interests, and motivation to learn. 7 Children at this age still vary dramatically in their development and there is also a wide age range in many kindergarten classrooms. Thus, effective kindergarten teachers must be highly skilled at individualizing interactions and differentiating instruction*."

169.    Plaintiffs and the Class include taxpayers whose tax payments are paid for purposes funding education in the City and State of New York, which includes monies allocated towards the funding of full time in person learning in public schools. By implementing proposed remote learning, staggered learning, blended learning and all other proposed alternative learning schemes

in place for September of 2020,  Plaintiffs and the Class will be deprived of the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

170.   By virtue of the fact that  Plaintiffs and the Class have been deprived of their property rights, specifically their right to work for a living and generate income,  Plaintiffs and the Class will be deprived of the ability to further provide monies towards tax revenues dedicated to the very benefits that they are funding via taxpayer dollars for education in the City and State of New York.

171.   By virtue of the above and the violation of  Plaintiffs' and the Class' constitutional rights,  Plaintiffs and the Class have and will yet suffer irreparable harm, entitling  Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

### FIFTH CLAIM FOR RELIEF
**Violation of the Contracts Clause of the U.S. Constitution and
the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

172.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

173.   Plaintiffs and the Class assert that Defendants have engaged in behavior that violated the Contracts Clause of the Constitution.

174.   The United States Constitution prohibits States from impairing the obligations of contracts: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." **U.S. Const. Art. I, § 10, Cl. 1**. The Contracts Clause applies to states and their subdivisions, including the Airport Authority. Horwitz-Matthews, Inc. v. City of Chi., 78 F.3d 1248, 1250 (7th Cir. 1996).

175.   To determine if a law trenches impermissibly on contract rights, the Courts have posed three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or

economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary. Energy Reserves Group, 459 U.S. at 411-13, 103 S.Ct. 697; Sanitation & Recycling Indus., 107 F.3d at 993.

176.    In the case at bar, the contractual impairment caused by the Governor's Executive Order(s) and the resultant closure of schools, together with proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning) has and will continue to stifle the economy and the ability of countless individuals to generate income and will force countless individuals to have their employment agreements adversely affected, if not breached outright. Parents are now forced to remain home for the purposes of supervising "remote" learning, and this obligation cannot now be avoided. Those with contracts related to services provided to schools, including but not limited to bus drivers, school support staff, vendors providing school supplies, food and other crucial services needed for the day-to-day operation of schools on a full time basis have now been impacted and will continue to be impacted by proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning).

177.    By all measures this is a substantial impairment.

178.    Next, the Executive Order(s) do not serve a legitimate public purpose in that as set forth herein, proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning) not only fail to remedy crucial social and economic problems identified herein, but rather proposed alternative learning schemes make said problems even worse.

179.    Finally, the Executive Order(s) are not reasonable to the extent that the return to in-person full time learning in September of 2020 is completely possible, feasible, and safe with the right precautions and measures taken, for example, a stronger emphasis on cleanliness in public schools which has long been overdue, more attention and monitoring for at-risk students and ensuring that students receive adequate medical attention at school, temperature monitoring, hand

washing stations, overall education and training on the issue of personal hygiene for staff and students, and the like.

180.    The fact that a contract-impairing law could have some legitimate public purpose does not mean there is no Contracts Clause violation. The impairment must also be one where the means chosen are reasonably and narrowly tailored necessary to meet the stated legitimate public purpose. U.S. Trust Co., 431 U.S. at 22-23, 97 S.Ct. 1505; see Sanitation & Recycling Indus., 107 F.3d at 993 ("A law that works substantial impairment of contractual relations must be specifically tailored to meet the societal ill it is supposedly designed to ameliorate."). If it is not, then the law violates the Contracts Clause.

181.    In the present case, the Executive Order(s) do not meet all of the societal ills that they are supposedly designed to ameliorate. Proposed alternative learning schemes planned for September of 2020 (in lieu of in-person full time learning) not only fail to remedy crucial social and economic problems identified herein, but rather proposed alternative learning schemes make said problems even worse.

182.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

### SIXTH CLAIM FOR RELIEF
**Violation of the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

183.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

184.    Defendants have violated the Privileges and Immunities Clause of the Fourteenth

Amendment to the United States Constitution and 42 U.S.C. § 1983 by denying the named Plaintiffs and other members of the Plaintiff Class their fundamental right to a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, a right that should be immune from state abridgement.

### SEVENTH CLAIM FOR RELIEF
**Violation of the Sixth and Seventh Amendments to the United States Constitution as well as the requirements of the federal Jury Selection and Service Act, 28 U.S.C. sec. 186, and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

185.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

186.    Defendants have violated the Sixth and Seventh Amendments to the United States Constitution and 42 U.S.C. § 1983, as well as the requirements of the federal Jury Selection and Service Act, 28 U.S.C. sec. 186, by failing to prepare Plaintiffs to be eligible for and to serve effectively on federal and state juries, and have also thereby denied all named Plaintiffs and members of the Plaintiff Class their rights to be tried in all criminal and civil cases by a jury of their peers selected at random from a fair cross section of the community.

### EIGHTH CLAIM FOR RELIEF
**Violation of the Republican Guarantee Clause of Article Four, Section Four of the United States Constitution, and the Award of Attorney's Fees Pursuant to 42 U.S.C. § 1988(b)**

187.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

188.    Defendants have violated the Republican Guarantee Clause of Article Four, Section Four of the United States Constitution by failing to provide the individual named Plaintiffs and

other members of the Plaintiff Class a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants capable of maintaining a republican form of government.

## NINTH CLAIM FOR RELIEF
### Violation of the Ninth Amendment to the United States Constitution

189.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

190.    The Ninth Amendment to the United States Constitution reads, in relevant part, as follows: "*The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.*"

191.    Put simply, pursuant to Amendment IX, the people retain rights absent specific enumeration. These rights are set forth at length in detail herein, including but not limited to: the right to an adequate education equal to that of their peers; the right to work, earn a living, and support a family, as well as right to enter into contracts and engage in commerce.

192.    The actions of the Defendants have violated the rights of Plaintiffs and the Class to work, earn a living, and support a family. When children and students are forced to remain at home pursuant to the proposed alternative learning schemes planned for September of 202, they must be supervised at the expense of parents and guardians' ability to leave their homes, go to work, pay bills, mortgage and put food on the table.

193.    The actions of the Defendants have interfered with the right of the Plaintiffs and the Class to enter into contracts, for example, absent the ability of parents and guardians to leave their homes and go to work, they are in breach of their implicit and/or explicit contracts of

employment with their employers.

194.    For all of the reasons stated *infra*, the actions of the Defendants have deprived Plaintiffs and other members of the Plaintiff Class of their fundamental right to a meaningful opportunity to obtain an adequate education.

195.    By virtue of the above and the violation of the Plaintiffs' and Class' constitutional rights, the Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

### TENTH CLAIM FOR RELIEF
### Violation of the Tenth Amendment to the United States Constitution

196.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

197.    Amendment X to the United States Constitution reads, in relevant part, as follows:

> *The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.*

198.    Put simply, pursuant to Amendment X, the people and states retain powers absent delegation to the United States. These powers are described at length in detail herein, including but not limited to the power to enforce: the right to an adequate education equal to that of their peers; the right to work, earn a living, and support a family, as well as the right to enter into contracts and engage in commerce.

199.    The actions of the Defendants have violated the rights of Plaintiffs and the Class to work, earn a living, and support a family. When children and students are forced to remain at home pursuant to the proposed alternative learning schemes planned for September of 2020, they must be supervised at the expense of parents and guardians' ability to leave their homes, go to work,

pay bills, mortgage and put food on the table.

200.    The actions of the Defendants have interfered with the right of Plaintiffs and the Class to enter into contracts, for example, absent the ability of parents and guardians to leave their homes and go to work, they are in breach of their implicit and/or explicit contracts of employment with their employers.

201.    Additionally, the decision as to the length of time that schools have been closed and will continue to be engaged in fatally flawed alternative learning schemes described herein, is a decision and/or power which by its very nature must be regulated by the people and not elected officials and/or the leadership of the City and State of New York. Put simply, the right to decide when and in what manner children and students return to school in September of 2020 lies within the province of the parents and guardians of said children and students.

202.    For all of the reasons stated *infra*, the actions of the Defendants have deprived Plaintiffs and other members of the Plaintiff class of their fundamental right to a meaningful opportunity to obtain an adequate education.

203.    By virtue of the above and the violation of the Plaintiffs' and Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

### ELEVENTH CLAIM FOR RELIEF
**Violation of the Prohibition in the United States Constitution against Bills of Attainder and Ex Post Facto laws**

204.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

205.    Article I, Section 9, Clause 3 of the United States Constitution states that "No Bill of Attainder or *ex post facto* Law shall be passed."

206.    The actions of the Defendants as described herein have resulted in the in-person, full time education of Plaintiffs and the Class (as opposed to proposed alternative learning schemes planned for September of 2020) now essentially being declared 'illegal'.

207.    For the reasons set forth *infra*, the Executive Orders have, by their effect*, ex post facto*, invalidated, voided, nullified and made illegal the contracts between Defendants and Plaintiffs and members of the Class related to services provided to schools, including but not limited to bus drivers, school support staff, vendors providing school supplies, and food and other crucial services needed for the day-to-day operation of schools on a full time basis, which are now essentially 'illegal'.

208.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## TWELFTH CLAIM FOR RELIEF
### Violation of the Thirteenth Amendment to the United States Constitution

209.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

210.    Amendment XIII to the United States Constitution reads, in relevant part, as follows:

> *Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.*

211.    By definition, involuntary servitude is a United States legal and constitutional term for a person laboring against that person's will to benefit another, under some form of coercion other than the worker's financial needs.

212.    The actions of the Defendants as described herein have resulted in the creation of

circumstances resulting in the Plaintiffs and the Class being subject to involuntary servitude by virtue of the fact that Plaintiffs and the Class have been deprived of fundamental rights described at length herein, including but not limited to the right to a fair education necessary for becoming a functioning member of society, the ability to earn a living and engage in gainful employment, while defendants have simultaneously failed to provide an adequate remedy to alleviate the burden upon Plaintiffs and the Class with regard to debts due and owing for property taxes due and owing to Defendants. Said property taxes include funds and resources allocated towards ensuring the right to a fair education.

213.    For the reasons set forth *infra*, Plaintiffs and the Class have been forced to expend their resources and labor towards and/or be burdened with the means to provide a benefit to Defendants. Specifically, said benefit is the property tax revenue collected by Defendants, which must by law be allocated towards ensuring the right to a fair education (and which has now been stripped from Plaintiffs and the Class), as well as the benefit derived by Defendants due to the fact that Plaintiffs and the Class are being forced to overextend themselves to provide the very resources needed for forced remote and alternative learning schemes, such as personal supervision at home of children and students for remote learning, allocation of physical space for same, and the like.

214.    Put simply, the resources and labor being expended by Plaintiffs and the Class, in light of the facts set forth herein, benefit the Defendants *solely*, and do not benefit the financial needs of Plaintiffs and the Class.

215.    By virtue of the above and the violation of Plaintiffs'; and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>
**Violation of Article I, Sections 1, 9, and 11 of the Constitution of the State of New York**

216.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

217.    Article I, Section 1 of the Constitution of the State of New York reads, in relevant part, as follows:

> *No members of this state shall be…deprived of any of the rights or privileges secured to any citizen thereof…*

218.    Article I, Section 9 of the Constitution of the State of New York reads, in relevant part, as follows:

> *…no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling…the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe…shall hereafter be authorized or allowed within this state…*

219.    Article I, Section 11 of the Constitution of the State of New York reads, in relevant part, as follows:

> *No person shall be denied the Equal Protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.*

220.    Defendants have violated the Constitution of the State of New York by denying to the named Plaintiffs and other members of the Plaintiff Class their fundamental interest in receiving a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

221.    Defendants have violated the Constitution of the State of New York by denying the

named Plaintiffs and other members of the Plaintiff Class a meaningful opportunity to obtain a basic education necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, without demonstrating any substantial state interest for doing so.

222.    Defendants have violated the Constitution of the State of New York by denying the named Plaintiffs and other members of the Plaintiff Class a meaningful opportunity to obtain the degree of education necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, without demonstrating any rational relationship to any legitimate state reason for doing so.

223.    As additionally set forth herein, Defendants have violated the rights of Plaintiffs and the Class, which include those in need of extra assistance, those that are learning disabled and/or those that require special education. As set forth herein, defendants' actions and proposed alternative learning schemes completely disregard, forget, and throw these individuals to the wayside and do not provide proper accommodations for these individuals.

224.    As a result of the Executive Orders currently in place resulting in closure of schools and institution of remote learning, as well as the proposed alternative learning schemes in place for September of 2020 (as opposed to full time, in-person education), gambling revenue which the State of New York must allocate towards education and which must be used to reinstate full time, in-person education has now been diverted for other purposes in violation of the Constitution of the State of New York. Put simply, while the Defendants continue to be relieved of the substantial financial burden arising out of payment of expenses normally arising from full time, in-person education, these monies, which include the Defendants' gambling revenue, are not being used for

their intended purposes, including, but not limited increasing teacher salaries, and the provision for adequate resources for schools to function properly in September of 2020 for full time, in-person learning, including technical resources, ensuring that schools are hygienic environments, and providing for proper training and instruction for educators.

225.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of Article III, Section 25 of the Constitution of the State of New York

226.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

227.    Article III, Section 25 of the Constitution of the State of New York reads, in relevant part, as follows:

> *Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.*

228.    By its very nature, the Constitution of the State of New York does not provide for the broad and sweeping authority that the Governor has asserted via the issuance of the Executive Orders and other actions taken by Defendants as set forth herein. Rather, these powers have been placed solely within the province of the legislature.

229.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional

rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## FIFTEENTH CLAIM FOR RELIEF
### Violation of Article IV, Section 3 of the Constitution of the State of New York

230.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

231.    Article IV, Section 3 of the Constitution of the State of New York reads, in relevant part, as follows:

> *The governor…shall take care that the laws are faithfully executed.*

232.    As set forth herein, the Constitution of the State of New York does not provide for the broad and sweeping authority that the Governor has asserted via the issuance of the Executive Orders and other actions taken by Defendants as set forth herein. Rather, these powers have been placed solely within the province of the legislature. Accordingly, the acts of the Defendants contravene the boundaries defined within New York Consolidated Laws, Executive Law - EXC § 29-a and are unlawful and unconstitutional.

233.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiffs and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## SIXTEENTH CLAIM FOR RELIEF
### Violation of Article VII, Section 8 of the Constitution of the State of New York

234.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

235.    Article VII, Section 8 of the Constitution of the State of New York reads, in relevant part, as follows:

> *The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking, but the foregoing provisions shall not apply to any fund or property now held or which may hereafter be held by the state for educational, mental health or mental retardation purposes.*

236.    By its very nature, the Constitution of the State of New York does not provide for aid to private corporations and associations, but nevertheless makes special exceptions for educational, mental health or mental retardation purposes.

237.    As set forth herein, Defendants actions have violated the spirit and purpose of Article VII, Section 8 of the Constitution of the State of New York, which recognizes the importance of education for individuals including Plaintiffs and the Class, which include those in need of extra assistance, those that are learning disabled and/or those that require special education. As set forth herein, Defendants' actions and proposed alternative learning schemes completely disregard, forget, and throw these individuals to the wayside and do not provide proper accommodations for these individuals.

238.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiff and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## SEVENTEENTH CLAIM FOR RELIEF
**Violation of Article XI, Section 1 of the Constitution of the State of New York**

239.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

240.    Article XI, Section 1 of the Constitution of the State of New York reads, in relevant part, as follows:

> *The legislature shall provide for the maintenance and support of a system*

> *of free common schools, wherein all the children of this state may be educated.*

241.    By its very nature, the Constitution of the State of New York reaffirms the fundamental right of all children, including Plaintiffs and the Class to a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, a right that should be immune from state abridgement.

242.    As set forth herein, Defendants actions have violated the spirit and purpose of Article XI, Section 1 of the Constitution of the State of New York, which recognizes the importance of education for individuals including Plaintiffs and the Class, which include those in need of extra assistance, those that are learning disabled and/or those that require special education. As set forth herein, Defendants' actions and proposed alternative learning schemes completely disregard, forget, and throw these individuals to the wayside and do not provide proper accommodations for these individuals.

243.    By virtue of the above and the violation of Plaintiffs' and the Class' constitutional rights, Plaintiffs and the Class have and will yet suffer irreparable harm, entitling Plaintiff and the Class to declaratory and injunctive relief and damages including an award of counsel fees.

## EIGHTEENTH CLAIM FOR RELIEF
### Permanent Injunction

244.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

245.    Plaintiffs and the Class assert that a permanent injunction is required in order to prevent the State and the City of New York from proceeding forward with proposed alternative

learning schemes planned for September of 2020 (in lieu of in-person full time learning) until such time that the State and the City of New York address the fatal flaws in said alternative learning schemes as set forth herein.

246.   A party seeking a permanent injunction must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the Plaintiff and Defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); see also EMA Financial LLC v. Aim Exploration, Inc., No. 18 Civ. 145, 2019 WL 689237, at *12 (S.D.N.Y. Feb. 19, 2019) (quoting and applying eBay).

247.   In the case at bar, the Plaintiffs and the Class have been and continue to suffer irreparable injury that monetary damages would be inadequate to recompensate for and a remedy in equity is warranted.

248.   Without a return to full-time in-person learning which existed prior to the issuance of the Executive Orders, Plaintiffs and the Class will be deprived of their fundamental right to have an education experience equal to that of their peers.

249.   This Court has previously been persuaded by the reasoning of the decisions that have granted permanent injunctions under circumstances similar to those presented here. "Monetary damages awarded after the fact do not provide an adequate remedy in a case where the actual loss caused by the infringement cannot be measured precisely." Bay side Boys, 2013 WL 5352599, at *7.

250.   In similar cases related to copyright law, the Second Circuit has noted that "[i]n the copyright realm, ... an injunction should be granted if denial would amount to a forced license to use the creative work of another." Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 84 (2d Cir.

2004).

251.    The permanent injunction would serve the public interest by prohibiting the infringing conduct in furtherance of the Plaintiffs' and the Class' Constitutional Rights. See, Living Room Steak House, 2016 WL 756567, at *7.

252.    "The decision to grant or deny permanent injunctive relief is within the Court's equitable discretion." eBay, 547 U.S. at 391, 126 S.Ct. 1837. Alpha Capital Anstalt v. Shiftpixy, Inc., 19 CIV. 6199 (PGG), 2020 WL 104697, at *9 [SDNY Jan. 9, 2020].

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class pray for the following relief and that the Court:

A.    Certify the Plaintiff Class;

B.    Declare the relevant Executive Order(s) unconstitutional;

C.    Enjoin the relevant Executive Orders;

D.    Enter a final judgment pursuant to 28 U.S. C §§2201, 2202 and Rules 54, 57 and 58, Federal Rules of Civil Procedure:

    i.    Declaring that all students in the United States have a right under the United State Constitution, the Constitution of the State of New York, and under the Jury Selection and Service Act of 1968 to a meaningful educational opportunity adequate to prepare them to be capable voters and jurors, to exercise effectively all of their constitutional rights, including the right to speak freely, to participate effectively and intelligently in a democratic political system and to function productively as civic participants in a democratic society; and

    ii.    Enjoining the Defendants, their successors in office, agents and employees from failing to adopt such laws, regulations policies and practices as are necessary to ensure that the individual Plaintiffs and the members of the Plaintiff Class are provided meaningful educational opportunities adequate to prepare them to be capable voters and jurors, to exercise effectively all of their constitutional rights, including the right to exercise effectively their rights to speak freely, to participate effectively and intelligently in a democratic political system and to function productively as civic participants in a democratic society;

E.  On all Cause of Actions, declaring that defendants violated the Plaintiffs' and Class' rights under the United States Constitution and the Constitution of the State of New York, and grant declaratory and injunctive relief and damages in favor of the Plaintiffs and the Class;

F.  Award costs, expenses and disbursements of this action, including reasonable attorney's fees to Plaintiffs and the Class pursuant to 42 U.S.C.§ 1988 and any other applicable provisions of law; and

G.  An order granting such other legal and equitable relief as the Court deems just and proper.

Dated: July 14, 2020                    Respectfully submitted,

                                        **FISHKIN, GURSHUMOV & NUSSBAUM, P.C.**

                                        By:    /s Marcus Aurelius Nussbaum_____
                                               Marcus A. Nussbaum, Esq. (MN 9581)
                                               Ilya Fishkin, Esq. (IF 4948)
                                               3059 Brighton 7th Street, 1st Fl.
                                               Brooklyn, NY 11235
                                               Tel: 718-509-0609
                                               Fax: 347-572-0439
                                               office@FGNLawFirm.com
                                               ***Attorneys for Plaintiffs***